UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN SULLIVAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 15 C 7521 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

John Sullivan ("Petitioner") challenges the sentence imposed for his wire fraud conviction pursuant to 28 U.S.C. § 2255. (R. 1.) For the reasons stated below, the petition is denied.

Petitioner and his brother Daniel Sullivan (collectively, "the Sullivans") owned a group of companies that offered remodeling services, including New Look Home Services, J&D Home Services, A-Z Home Services, and Contract Services. *United States v. Sullivan*, 765 F.3d 712, 714 (7th Cir. 2014). In the words of the U.S. Court of Appeals for the Seventh Circuit: "While [the Sullivans] provided honest work on construction jobs when their clients paid in cash, they fabricated a far more profitable, but illegal scheme." *Id.* Specifically, they promised homeowners that they would remodel their homes at a discount and "duped numerous people into refinancing their homes and paying the loan proceeds directly to one of the [Sullivans'] companies." *Id.* Once the Sullivans had the funds in hand, they "left the job sites unfinished and the homeowners' finances in disrepair." *Id.*

The Sullivans specifically targeted their businesses to poor neighborhoods on the South and West sides of Chicago. *Id.* They employed telemarketers and other individuals who would

go out in these communities to distribute flyers and cold-call homeowners. *Id.* Telemarketer

Martin Kelliher was told by Daniel Sullivan to look for "elderly, ignorant homeowners." *Id.*

Similarly, Petitioner told Kelliher "[t]he more ignorant, the better" and "the older, the better." *Id.*

"Reading from a script provided by the [Sullivans], employees asked unsuspecting homeowners

if they needed remodeling work; if they said yes, the employees offered free in-person

estimates." *Id.* Once an employee obtained a lead, the Sullivans either went to the home

themselves or sent one of their salespeople, James Browning and Pat Rooney. *Id.* at 715.

Petitioner told Browning to have customers sign blank contracts, which he said were to be "used

as a release" or "in case we ever need to amend something to suit us better." *Id.* He "maintained

the predatory sales mantra, telling Browning that the small cash remodeling jobs 'keep[ ] the

track open, but the refinancing, we get rich with those.'" *Id.*

If a homeowner agreed to a project, the Sullivans would refer them to a preselected loan

officer to perform the refinancing. *Id.* The Sullivans required homeowners to sign "letters of

direction" so that the title company closing on the loan would send the proceeds directly to the

Sullivans' companies. *Id.* Once the Sullivans had the checks in hand, they would go back to the

homeowner and have them sign over the checks to them, telling homeowners that they needed to

pay up front before any work could begin. *Id.* The Sullivans hired subcontractors to perform

some of the work they contracted to do, but they routinely "abandoned the remodeling jobs

before completion." *Id.* Between 2002 and 2006, the Sullivans obtained approximately $1.2

million from more than 40 homeowners who fell victim to their scheme. *Id.*

In January 2011, a grand jury returned an indictment charging the Sullivans with wire

fraud in violation of 18 U.S.C. § 1343. *Id.* They were tried together before U.S. District Judge

Blanche Manning. *Id.* The government presented testimony from several victimized

homeowners. *Id.* The testimony of Richard Thomas provided but one example of the Sullivans'

scheme. Thomas was a 79-year old man who lived in a two-flat building on Chicago's South

side. *United States v. Sullivan*, No. 10 CR 821, Trial Tr. at 218-21. In 2004, Thomas responded

to a flyer left on his door by one of the Sullivans' employees; he ultimately agreed to pay J&D

Home Services approximately $76,000 to remodel his home and a coach house located on his

property. *Id.* at 222-25. Thomas had already spent approximately $20,000 to repair the coach

house but wanted additional work done on it. *Id.* at 225. Thomas met with Petitioner and

explained the work that he wanted done. *Id.* at 223-25. Petitioner referred Thomas to a

preselected mortgage broker, and Thomas refinanced his mortgage in order to pay for the work.

*Id.* at 229-31. The refinancing resulted in approximately $77,900 paid in two installments. *Id.* at

235. A letter of direction purportedly signed by Thomas directed the title company to disburse

the checks directly to J&D, but Thomas did not recall ever signing such a document. *Id.* at 235-

36. After the closing, Petitioner brought Thomas a check in the amount of $60,000 and told him

that he had to endorse it before the work could begin, which Thomas did. *Id.* at 236-37. At the

urging of Daniel Sullivan, Thomas subsequently endorsed another check for approximately

$17,000 so that it could be cashed by the Sullivans. *Id.* at 237.

After no work was done on his home, Thomas grew concerned and cancelled the second

check; this caused Petitioner to obtain a replacement check from the title company and demand

that Thomas endorse it to J&D, which he did. *Id.* at 237-38. The Sullivans never remodeled

Thomas's coach house, however, and instead they tore it down and told Thomas that it had been

infested with termites. *Id.* at 239-40. Thomas repeatedly asked to see a report showing that the

property was termite-infested, but he never received any such report. *Id.* at 240-44. After tearing

down the coach house, the Sullivans' subcontractor performed some drywall work inside

Thomas's home, but the work was never actually completed. *Id.* at 244-45. When Thomas

complained, Petitioner and his brother showed him documents that he had purportedly signed

stating that he was completely satisfied with the work they had performed. *Id.* at 259-60. He had

no recollection of signing any such documents. *Id.* at 260. The Sullivans had another document

purporting to show that Thomas had agreed to pay them $80,000 to tear down his coach house,

but he testified that he never made any such agreement.[1] *Id.* at 258-61.

In addition to the testimony of several victims, the government presented testimony from

former employees of the Sullivans and a subcontractor who had performed work on several of

their remodeling projects. *Sullivan*, 765 F.3d at 715. The government also presented the

Sullivans' business and personal records, as well as testimony from a government investigator

who had examined their finances in detail. *Id.* At the close of the evidence, the jury found each

of the brothers guilty of two counts of wire fraud. *Id.*

After Judge Manning's retirement, the case was reassigned to this Court, which presided

over the sentencing proceedings. No. 10 CR 821, R. 289. At sentencing, the Court calculated the

loss associated with the Sullivans' scheme at approximately $750,000. *Sullivan*, 765 F.3d at 716.

The government had advocated for a loss calculation of over a $1 million. No. 10 CR 821,

Sentencing Tr. at 64-72. The Court, however, found merit to the argument raised by Petitioner's

counsel that the loss amount should be reduced for certain expenses that were paid for work,

services, or goods actually provided to customers. *Id.* at 67-72. Because the guidelines

specifically prohibited deductions for goods and services provided by anyone falsely posing as a

---

[1] A victim impact statement submitted by an attorney from the Legal Assistance Foundation of Metropolitan Chicago, who represented a number of the elderly victims in civil lawsuits, summarized the damage caused by the Sullivans' fraud scheme: "[T]hese defendants caused tremendous emotional distress, inconvenience, and aggravation to these elderly individuals. They lost their sense of trust, balance, and confidence in themselves as a result of being victimized in this manner. They felt embarrassed and ashamed about having been ripped off, and having to rely on family members after a lifetime of adult independence. The defendants' conduct drained the victims' home equity and hard earned assets, and jeopardized, literally, the roof over their heads and the homes they had worked for all their lives." No. 10 CR 821, R. 274 at 2.

licensed professional—which the Sullivans had done—they could not obtain a credit for many of their expenses. *Id.* at 67-69. However, because they used licensed subcontractors to perform some of the work, the Court agreed with Petitioner's counsel that certain deductions were in order. *Id.* at 71-72. Despite the lack of clear documentation to show exactly how much was paid, the Court granted the Sullivans certain credits that reduced the sentencing enhancement by two levels, from 16 to 14, based on a loss calculation of between $400,000 and $1 million. *Id.* at 72-73. The Court also applied five separate sentencing enhancements, finding that the Sullivans' conduct involved: "(1) vulnerable victims; (2) a violation of a prior court order; (3) sophisticated means; (4) mass-marketing or ten to forty-nine victims; and (5) leadership or organization of the scheme." *Sullivan*, 765 F.3d at 715. Both of the Sullivans were ultimately sentenced to 168 months in prison. *Id.*

They appealed, challenging only the length of their sentences. *Id.* Specifically, they argued that the Court's loss calculation was not adequately supported by the record and that the application of the five additional enhancements was erroneous. *Id.* In August 2014, the Seventh Circuit issued an opinion rejecting these arguments and affirming their sentences in all respects. *Id.* at 716-20.

In August 2015, Petitioner filed the present petition under Section 2255 asserting various claims of ineffective assistance of counsel.[2] (R. 1, Pet.) Although he purports to assert 16 separate grounds for relief, they are essentially different iterations of the same claim: that his trial counsel provided ineffective assistance in connection with the loss calculation. (*Id.* at 5-24.) The government filed a response arguing that Petitioner has failed to establish an entitlement to relief under Section 2255. (R. 21, Resp.) Upon his request, the Court granted Petitioner certain

---

[2] Daniel Sullivan also filed a petition under Section 2255, which this Court denied. *United States v. Daniel Sullivan*, No. 15 C 3067, R. 1, 4. His case is presently on appeal. *Id.*, R. 6.

discovery materials to assist him in litigating his petition, and those documents have since been turned over to him. (R. 31, Order; *see also* R. 46, Mot.) After several extensions, Petitioner filed a lengthy reply in support of his petition. (R. 47, Reply.)

## LEGAL STANDARD

A federal prisoner can seek to vacate his sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013).

## ANALYSIS

Before turning to the merits, the Court must address certain motions filed by Petitioner. He has filed a motion for leave to file an amended petition and a motion to compel production of discovery, both of which are duplicates of his earlier filings. (R. 38, 39; *compare with* R. 24, 25.) The Court fully considered and ruled on those earlier filings in a prior order. (R. 31.) Petitioner has not pointed to any errors in the Court's analysis and instead simply refiled the exact same motions. For the reasons already explained, the motions are denied. In a third motion, Petitioner seeks an extension of time to file his reply brief. (R. 46.) He has since filed the reply, and the signature page reflects that he tendered it to prison officials for mailing approximately 14 days after the deadline. (R. 47, Reply at 44.) Given Petitioner's *pro se* status and the lack of any discernable prejudice to the government from this brief delay, the Court grants his request. Petitioner's reply will be deemed timely and will be fully considered by the Court in ruling on the petition.

Turning to the merits, all of Petitioner's claims center on the performance of his trial

counsel, Michael Leonard. (R. 1, Pet. at 5-24.) Under the Sixth Amendment, a criminal

defendant is entitled to "'effective assistance of counsel'—that is, representation that does not

fall 'below an objective standard of reasonableness' in light of 'prevailing professional norms.'"

*Bobby v. Van Hook*, 558 U.S. 4, 16 (2009) (per curiam) (quoting *Strickland v. Washington*, 466

U.S. 668, 686 (1984)). To prevail on a claim of ineffective assistance of counsel, the petitioner

must show that: (1) counsel's performance was deficient; and (2) the deficient performance

prejudiced him. *Strickland*, 466 U.S. at 687. On the deficiency prong, the central question is

"whether an attorney's representation amounted to incompetence under 'prevailing professional

norms,' not whether it deviated from best practices or most common custom." *Harrington v.

Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). Counsel "need not be

perfect, indeed not even very good, to be constitutionally adequate." *McAfee v. Thurmer*, 589

F.3d 353, 355-56 (7th Cir. 2009) (citation omitted); *see also Harrington*, 562 U.S. at 110

("[T]here is no expectation that competent counsel will be a flawless strategist or tactician.").

Counsel's strategic decisions are entitled to considerable deference. *Yu Tian Li v. United

States*, 648 F.3d 524, 527-28 (7th Cir. 2011). "The defendant must overcome the presumption

that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

at 528 (citation omitted). In evaluating counsel's performance, the Court must avoid the benefit

of hindsight and respect its "limited role in determining whether there was manifest deficiency in

light of information then available to counsel." *Premo v. Moore*, 562 U.S. 115, 125 (2011). In

egregious cases a single error can amount to ineffective assistance, but ordinarily the Court must

consider counsel's "performance as a whole rather than focus on a single failing or oversight."

*Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). As the Seventh Circuit has explained: "[I]t is

essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011) (citation omitted).

On the prejudice prong, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. To warrant relief, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

## I.     Deficient Performance

All of Petitioner's grounds for relief focus on Leonard's performance in connection with the calculation of loss. (R. 1, Pet. at 5-24.) In cases of theft or fraud, a defendant's offense level is based in part on the amount of "loss" caused by his conduct. U.S.S.G. § 2B1.1(b)(1);[3] *United States v. Robey*, 831 F.3d 857, 865-66 (7th Cir. 2016). "This includes the loss caused by the offenses of conviction, as well as 'all acts and omissions . . . that were part of the *same course of conduct* or *common scheme or plan* as the offense of conviction.'" *Robey*, 831 F.3d at 866 (quoting U.S.S.G. § 1B1.3(a)(2)). A "common scheme or plan" means that two or more offenses are "substantially connected to each other by at least one common factor; such as common

---

[3] All references to the U.S. Sentencing Guidelines are to the 2011 version in effect at the time of Petitioner's sentencing hearing. *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."); *United States v. Edwards*, 836 F.3d 831, 833 n.1 (7th Cir. 2016) (applying guidelines in effect at time of sentencing).

victims, common accomplices, common purpose, or similar *modus operandi*." *Id.* (quoting

U.S.S.G. § 1B1.3 n.9(A)). Even if offenses do not meet the requirements of a common scheme or

plan, they still may qualify as part of the "same course of conduct" if they are "sufficiently

connected or related to each other as to warrant the conclusion that they are part of a single

episode, spree, or ongoing series of offenses." *Id.* (quoting U.S.S.G. § 1B1.3 n.9(B)).

Additionally, the Court must apply the greater of "actual" or "intended" loss. U.S.S.G.

§ 2B1.1(b)(1); *id.* § 2B1.1 cmt. n.3(A). "Actual loss" means "the reasonably foreseeable

pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). "Intended loss"

refers to the "(I) the pecuniary harm that was intended to result from the offense; and (II)

includes intended pecuniary harm that would have been impossible or unlikely to occur."

U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).

Calculating loss is something of an art and not a science, and the Court is afforded wide

discretion in making this determination. *United States v. Stein*, 756 F.3d 1027, 1029 (7th Cir.

2014); *Sullivan*, 765 F.3d at 716. Additionally, "[b]ecause the judge is the factfinder at

sentencing, . . . he may draw reasonable conclusions about the testimony and evidence

presented." *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013). The Court need only make a

"reasonable estimate" of the applicable loss, and mathematical precision is not required. *Stein*,

756 F.3d at 1029 (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)). To have the loss calculation set aside,

a defendant must show that the Court's calculation was "not only inaccurate but outside the

realm of permissible computations." *Id.* (citation omitted).

As explained above, the performance of Petitioner's counsel must also be viewed with a

high degree of deference, and the applicable standard leaves room for a variety of strategic

approaches and even reasonable errors. *See Harrington*, 562 U.S. at 104-05; *Premo*, 562 U.S. at

124-26. Because of the applicable standards, Petitioner has a difficult burden in this case: In effect, he must show that his counsel's performance was so deficient that it led to a loss calculation outside the bounds of any permissible computation that could have been made. With these principles in mind, the Court turns to Petitioner's arguments.

Petitioner argues that counsel was "inattentive and negligent" in his representation at sentencing, (R. 1, Pet. at 12), but the record does not support such a claim. Prior to sentencing, the probation office prepared a Presentence Investigation Report ("PSR"), which calculated Petitioner's base offense level as 7 and proposed a 16-level enhancement based on a loss calculation of approximately $1.3 million. *See* 10 CR 821, Sentencing Tr. at 61-72. The primary basis for the loss calculation was the investigation of the government's financial expert, Rick Kozma, who conducted a thorough review of the Sullivans' bank records, tax returns, and other financial documents. *See id.*, Trial Tr. at 1498-1584. Among other matters, the government's investigation showed that the Sullivans' record-keeping was haphazard and that they went to considerable lengths to hide their fraud scheme.[4] *Id.* at 1498-1500; *see also id.*, Sentencing Tr. at 31-33. Kozma's investigation also revealed that the Sullivans regularly commingled their corporate and personal finances and used corporate funds to pay personal expenses, including paying thousands of dollars toward the credit card bills of Petitioner's then-wife, Diane Sullivan. *Id.*, Trial Tr. at 1539-43.

The lack of proper record-keeping and the fact that the fraud involved several corporate entities made it challenging for both sides—as well as the Court—to determine the appropriate amount of loss. Faced with these difficulties, Leonard opted for a strategy of attacking the government's case to argue that the government could not carry its burden of proof. Counsel's

---

[4] Indeed, Petitioner appears to concede as much in his petition when he states that "[l]egitimate business deposits were commingled with fraudulent receipts, in the same checkbooks." (R. 1, Pet. at 9.)

strategic decisions are entitled to substantial deference, *Yu Tian Li*, 648 F.3d at 527-28, and under the facts of this case, the Court cannot conclude that this decision fell below an objective standard of reasonableness. In fact, the record shows that Petitioner's counsel made a vigorous attempt to discredit the government's loss calculation and argue for a lower number, and in part his efforts were successful.

At trial, counsel cross-examined Kozma in an attempt to show that his financial investigation was incomplete and cursory. *See* No. 10 CR 821, Trial Tr. at 1550-77. He also suggested through his questioning that certain proceeds of the fraud could have gone to other individuals whose records were not examined by Kozma, including cooperating witnesses Browning and Kelliher. *Id.*

At sentencing, counsel filed a 63-page memorandum attacking various aspects of the PSR, including 17 pages devoted to the government's loss calculation and nearly 400 pages of exhibits. *Id.*, R. 277. Counsel argued that the government's calculation was erroneous for several reasons. First, he argued that the government's loss amount was based on a faulty assumption that every contract over $8,000 was fraudulent, which in turn relied on the testimony of one of the Sullivans' subcontractors, Kryszstof Koterba. *Id.* at 6. In his memorandum, counsel picked apart Koterba's trial testimony and argued at length that his testimony did not support an inference that all jobs over this threshold amount were fraudulent. *Id.* at 6-9. Counsel also argued that the government failed to prove that contracts the Sullivans made with approximately 20 individuals were actually fraudulent. *Id.* at 9-10. By counsel's calculation, this meant that the $1.3 million figure had to be reduced by at least $960,000, leaving a loss amount of $280,000. *Id.* at 10. Counsel then argued that the loss amount had to be further offset for legitimate business expenses incurred in connection with work actually performed for customers. *Id.* at 10-

20. He went through the trial record in detail to point out testimony showing that the Sullivans had completed certain work and incurred various expenses in connection with many jobs. *Id.* at 14-20. In counsel's view, the evidence supported at best an eight-level increase in Petitioner's sentence, not the 16-level increase sought by the government. *Id.* at 20.

Petitioner repeatedly faults counsel for failing to offer a "rebuttal" to the government's loss calculation, (R. 1, Pet. at 6, 14), but in fact the record shows that counsel did exactly that. In addition to filing a lengthy written memorandum, counsel vigorously argued these points at the sentencing hearing. *Id.*, Sentencing Tr. at 1-134. The government objected to the loss amount being reduced for expenses incurred in the course of the fraud, but this Court sided in part with Petitioner's counsel. *Id.* at 59-72. Based on Leonard's arguments, the Court ultimately gave Petitioner credits for certain business expenses—over the government's objection and despite the lack of documentation showing exactly what was spent. *See id.* Because of the poor record-keeping that permeated the Sullivans' businesses, it is true that this figure involved some amount of estimation. But Petitioner seems to concede that some level of estimation was necessary when he states that "[t]here is no 'typical' or generalized costing percentiles regarding labor and materials in the remodeling industry." (R. 1, Pet. at 10.) Again it must be noted that calculating loss does not require mathematical certainty. *Stein*, 756 F.3d at 1029. If anything, the Court took an overly broad estimation that favored Petitioner.

Petitioner also claims that counsel was deficient in stipulating to the admission of the government's summary charts. (R. 1, Pet. at 9.) The charts were in essence summaries of Kozma's examination of records obtained from third parties, including the Internal Revenue Service and various financial institutions. Leonard did in fact object to one of the charts on grounds of relevance and unfair prejudice, but Judge Manning overruled his objection. *See* No.

10 CR 821, Trial Tr. at 1489-98. Counsel then requested a limiting instruction to minimize any prejudice to Petitioner. *Id.* at 1496-98. Petitioner is correct that counsel stipulated to the government's use of the other summary charts, but this was only after he had raised specific objections to the underlying records and those objections were overruled. *Id.* at 1490-94; *see id.*, R. 224, 237. Petitioner has not suggested what else counsel could have done to keep the underlying documents or the charts summarizing them out of the record, as the records were fully admissible under the Federal Rules of Evidence and were properly authenticated by their custodians. *See* FED. R. EVID. 803(6); FED. R. EVID. 803(8); FED. R. EVID. 901(a). Counsel did what he could to minimize the damage of Kozma's findings by cross-examining him regarding the thoroughness of his investigation.[5] No. 10 CR 821, Trial Tr. at 1550-77. In short, Petitioner has not established deficient performance on this ground.

Petitioner also complains that counsel failed to call any "satisfied homeowners" as witnesses to show that he had performed "honest work." (R. 1, Pet. at 18.) But again, the record reflects that counsel tried to do exactly that. Once the government rested, Petitioner's counsel stated that the defense intended to call several homeowners who had contracted with the Sullivans' companies for remodeling work and who were satisfied with the work that was done. No. 10 CR 821, Trial Tr. at 1597. The government objected to the relevancy of these witnesses, but Petitioner's counsel argued vigorously in support of the Sullivans' right to call them. *Id.* at 1597-1608. Ultimately, Judge Manning stated that she would not bar this testimony altogether, but shortly after Daniel Sullivan's counsel began questioning the first such witness, the Judge ruled that the testimony was irrelevant. *Id.* at 1659-65. Petitioner's counsel continued to press his

---

[5] To the extent Petitioner wanted counsel to challenge Kozma's qualifications, there would have been little basis for such an argument. Prior to his work for the U.S. Attorney's Office, Kozma worked as an auditor for the Internal Revenue Service for 35 years; his testimony showed that he was well-versed in accounting methods and that he conducted a thorough review of the records in this case. No. 10 CR 821, Trial Tr. at 1499-50.

view that the testimony was relevant, but Judge Manning disagreed. *Id.* at 1661-64. When it was clear that he was not going to succeed in his argument, counsel made an offer of proof in order to preserve his objection for appeal. *Id.* at 1661-62.

Counsel then attempted to question two other homeowners to try to rebut the government's claim that the Sullivans had exclusively targeted homeowners in poor areas of the city, but Judge Manning ultimately barred the bulk of this testimony as well. *Id.* at 1675-1706. Counsel then called two more witnesses who had work done on their homes by the Sullivans' companies, but he was only permitted to elicit testimony showing where they lived. *Id.* at 1707-17. The record reflects that the defense team lined up more than 20 witnesses to offer testimony about the work the Sullivans had performed on their homes. *See id.* at 1718. Petitioner's counsel ultimately moved for a mistrial based on Judge Manning's refusal to let him call these witnesses, but his motion was denied. *Id.* at 2093. Petitioner ignores these efforts entirely in his petition.

In addition to the witnesses outlined above, Petitioner's counsel presented other evidence in support of the defense case. He presented testimony from the president of a home remodeling company who stated that certain practices employed by the Sullivans were very common in the remodeling industry. *Id.* at 1617-34. Counsel also called a mortgage broker who had performed legitimate work with the Sullivans' companies; among other matters, the broker testified that the Sullivans had no involvement in the refinancing process, which was intended to refute the government's claim that the refinancing was part of their scheme to defraud. *Id.* at 1635-61. In

short, the record completely belies Petitioner's claim that counsel failed to prepare a defense and instead shows that counsel worked hard to refute what he could of the government's claims.[6]

The Court must also consider Leonard's overall performance during this case. *See Sussman*, 636 F.3d at 351; *see also Harrington*, 562 U.S. at 111 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."). The record reflects that Leonard filed his appearance shortly after Petitioner's arrest, and he quickly filed a pretrial motion aimed at getting Petitioner needed medical care at the facility where he was being housed. No. 10 CR 821, R. 38, 42. A few months later, counsel sought the appointment of a medical expert to examine Petitioner in an effort to bolster Petitioner's request for release on bond. *Id.*, R. 55. Both of these motions were successful. *Id.*, R. 56. After the medical exam was completed, counsel moved for Petitioner's release on bond, and at the hearing on that motion he presented witnesses and argued on Petitioner's behalf. *Id.*, R. 62, 86.

Counsel filed a plethora of other motions in the months leading up to trial, including a motion for severance and more than 20 separate motions in limine. *Id.*, R. 92, 101-10, 112, 118-22, 127-33, 136, 179-81, 191. Counsel also fought hard to obtain information within the government's possession, going so far as to seek an emergency postponement of the trial so that he could search for additional exculpatory evidence. *Id.*, R. 144. He was successful in these efforts. *Id.*, R. 155. When additional information was turned over to him that he felt was

---

[6] Petitioner also complains that Leonard failed to turn over documents to him after the case was over so that he could pursue the present petition under Section 2255. (R. 1, Pet. at 15.) In particular, he wanted "copies of the Government's Summary (Financial) Exhibits and all of its subparts, including Chart 5." (*Id.*) The record reflects that after the petition was filed, Leonard turned over all the documents in his possession and also filed a motion on Petitioner's behalf to try to obtain additional documents from the government. (R. 6.) This Court ultimately granted Petitioner certain discovery and ordered the government to turn over the summary charts Petitioner mentions above. (R. 31.) Petitioner has not established any wrongdoing by counsel or any prejudice to himself as a result. But regardless, actions taken by counsel long after Petitioner was convicted and sentenced would not permit the Court to conclude that Petitioner's sentence was "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).

incomplete, he moved for immediate dismissal of the charges as a sanction. *Id.*, R. 158. His efforts ultimately resulted in dismissal of two counts of the indictment prior to trial. *Id.*, R. 200.

The trial transcripts also show that Leonard was a capable advocate during the two-week trial, putting the government's evidence to the test each step of the way. He raised numerous objections, gave an opening statement, cross-examined the government's witnesses, moved for a judgment of acquittal at the close of the government's case, presented witnesses and evidence on Petitioner's behalf, actively participated in the jury instruction conference, made a closing argument, and argued on Petitioner's behalf at sentencing, not only arguing the applicable law but also attempting to paint Petitioner in a sympathetic light. No. 10 CR 821, Trial Tr. at 42-2095; *id.*, Sentencing Tr. at 1-113. The Court is cognizant that this was not an easy case to defend, as it involved a number of very sympathetic victims and a long paper trail documenting Petitioner's fraud scheme. Leonard's performance may not have been perfect, but the record shows that Petitioner clearly received the "'counsel' of which the sixth amendment speaks." *Sussman*, 636 F.3d at 351. He has therefore failed to satisfy the first prong of the inquiry.

## II.    Prejudice

On the second prong, Petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. To meet this standard, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. Petitioner cannot meet that standard.

While loss was calculated at approximately $750,000, the sentence Petitioner received was based on a loss *range* of between $400,000 and $1 million. No. 10 CR 821, Sentencing Tr. at 72-73. Thus, for the loss calculation to make any difference in connection with Petitioner's

16

sentence (such that he could show he was prejudiced by counsel's allegedly deficient performance) Petitioner would have to show that had counsel acted competently, there is a reasonable probability that he could have gotten the loss calculation below $400,000—almost half of what the Court calculated. *See Strickland*, 466 U.S. at 694. Given the mountain of evidence showing that the Sullivans' *modus operandi* was to take thousands of dollars from their customers while doing little to no actual work for them (other than painting or other minor cosmetic work), there is nothing before the Court to suggest that Petitioner could have possibly made such a dramatic showing. This Court specifically stated at sentencing—and it continues to be the Court's view—that even if there were some legal error made in calculating loss, the appropriate number would not fall below $500,000 given the evidence presented at trial. *See id.* at 72. As the fact-finder at sentencing, this Court was permitted to draw such conclusions based on its view of the evidence. *Warren*, 712 F.3d at 1104.

Petitioner provides a couple of different loss calculations based on *his* view of the evidence, and he calculates loss at somewhere around $300,000. (*See* R. 1, Pet. at 8 (calculating loss at $344,852.79); R. 47, Reply at 19-28 (calculating loss at $304,227.42).) But accepting his proposed calculations would require the Court to assume the validity of the documents that the Sullivans themselves created in the course of their fraud. (*See* R. 47, Reply at 18-28.) It would also require the Court to presume—in Petitioner's words—that all "[p]rojects were fulfilled in accordance with the order in which the contracts were signed, with the exceptions being cases where issues arose and completion was either delayed due to material delay, weather issues in the Chicago region during the winter months, or return to correct deficiencies or problems."[7] (*Id.*

---

[7] In a similar vein, Petitioner asserts that "[a]ll refinancing jobs must have had at least <u>some</u> work completed" because "[p]art of the scheme was always to do an 'opener' job in order to 'lock in' a refinance possibility." (R. 1, Pet. at 21.) The Court is not required to simply credit Petitioner's self-serving statements about how he conducted the fraud scheme which are unsupported by the trial record.

at 18.) These are faulty assumptions, which the Court would not have accepted based on the extensive evidence showing that the Sullivans fabricated documents and routinely left their remodeling jobs uncompleted.

In fact, Petitioner's counsel *did* argue for a loss amount somewhere below $280,000, but the Court rejected this argument. *See* No. 10 CR 821, R. 277 at 10. Petitioner's proposed calculations would have fared no better, and counsel cannot be deemed ineffective for failing to raise arguments that had no merit. *Warren*, 712 F.3d at 1104. Petitioner believes that counsel should have hired an expert in accounting or "pricing profit" to support an alternative loss calculation, but there is nothing before the Court to suggest that anyone examining the available records would have come up with conclusions that were any different than Kozma's. Petitioner seems to be harboring a fundamental misunderstanding about the deductions that counsel could have obtained for him. As was fully explained at sentencing, Petitioner could not obtain credit for the bulk of the so-called "honest" work his companies performed because he and his brother falsely held themselves out as licensed contractors. No. 10 CR 821, Sentencing Tr. at 67-72; *see also* U.S.S.G. § 2B1.1 cmt. n.3(F)(v).

For these reasons, Petitioner has not established that his trial counsel provided him with ineffective assistance in connection with the loss calculation or that he was prejudiced as a result. *See Brown v. United States*, No. 15-CV-9372, 2016 WL 1583605, at *5 (N.D. Ill. Apr. 20, 2016) (finding that Section 2255 petitioner failed to establish ineffective assistance counsel in connection with loss calculation where petitioner's alternative loss argument "simply has no merit"); *McCloud v. United States*, 837 F. Supp. 2d 778, 787 (N.D. Ill. 2011) (denying Section 2255 petitioner's ineffective assistance claim based on counsel's performance in connection with

loss calculation where the Court reviewed the loss amount "once again" and determined that "the method [ ] used in calculating loss . . . was proper"). Therefore, the petition is denied.

## III.    Certificate of Appealability

As a final matter, the Court must decide whether to grant Petitioner a certificate of appealability. To obtain a certificate of appealability, Petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted).

This Court is cognizant that U.S. Circuit Judge Ilana Diamond Rovner recently granted a certificate of appealability to Daniel Sullivan on two issues: his counsel's performance in connection with the loss calculation and his counsel's performance pertaining to the exclusion of jurors. *See Sullivan v. United States*, No. 15-2023 (7th Cir. Nov. 1, 2016). Petitioner raises the first claim but not the second in his petition. Although this Court is not convinced that Petitioner received ineffective assistance from his trial counsel in connection with the loss calculation, reasonable jurists could reach a different conclusion. Accordingly, the Court will grant Petitioner a certificate of appealability.

## CONCLUSION

For the foregoing reasons, Petitioner's motion to compel (R. 38) and motion for leave to amend (R. 39) are DENIED. Petitioner's motion for an extension of time (R. 46) is GRANTED, and his reply (R. 47) is deemed timely filed. The petition (R. 1) is DENIED. Petitioner is GRANTED a certificate of appealability on the following issue: Whether he was denied the

19

effective assistance of counsel in violation of the Sixth Amendment based on his counsel's

advocacy in connection with the calculation of loss.


ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**


**Dated: November 22, 2016**